1
2
3
4
5          **UNITED STATES DISTRICT COURT**
6           **DISTRICT OF NEVADA**
7
LUSAN RAHMAN,
8
          *Petitioner*,                          2:13-cv-01334-GMN-GWF
9
vs.
10                                                         ORDER
11   ADAM PAUL LAXALT, *et al.,*
12          *Respondents*.
13   ────────────────────────────────
14          This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for
15   a decision on the merits as to the remaining grounds.
16                                  ***Background***
17          Petitioner Lusan Rahman challenges his 2007 Nevada state conviction, pursuant to
18   a jury verdict, of attempted murder with the use of a deadly weapon, extortion, discharging
19   a firearm out of a motor vehicle, and discharging a firearm at or into a structure.  He
20   challenged the conviction on direct appeal and in a state post-conviction petition.[1]
21          In his first ground for relief, Rahman challenges the sufficiency of the evidence on the
22   conviction for attempted murder with the use of a deadly weapon.  He alleges that the
23   ────────────────
24          [1]Petitioner apparently was released on parole in 2016, during the pendency of this action; and his
     sentences potentially all since may have fully expired by this point. The presentence investigation report
25   further indicated that immigration proceedings were possible.  See ECF No. 30, at electronic page 5.  The
     matter is not mooted by any such developments due to the collateral consequences of the conviction. *E.g.,*
26   *Carafas v. LaVallee*, 391 U.S. 234 (1968).  The collateral consequences include those potentially affecting an
     ability to reenter the United States, in the event of a removal proceeding, as well as those applicable to
27   petitioner while in the United States, whether following reentry or otherwise. *Cf. United States v. Villamonte-*
     *Marquez*, 462 U.S. 579, 581 n.2 (1983)(federal criminal prosecution); *United States v. Chang Hong*, 671 F.3d
28   1147, 1149 n.3 (10th Cir. 2011)(§ 2255 motion).

evidence was insufficient to establish that he acted with the deliberate intention to unlawfully kill another person.

The Court accordingly will summarize trial evidence relevant to this ground as well as to other grounds in the petition.

The evidence at trial included the following.[2]

As backdrop, the Las Vegas accounting firm of Main Amundson hired Lusan Rahman as a staff accountant in August 2006. As ninety days from his hiring approached, the firm decided to fire him.

Partner John Amundson called Rahman into his office on Tuesday, November 7, 2006, for a closed-door meeting with Amundson and the office manager, Judi Hansen.

According to Amundson's testimony, after he told Rahman that he was being let go, Rahman became violently angry and erupted into a profanity-laced tirade. He grabbed his chair, threw it down, and said he was going to kill Amundson and then his family. Rahman grabbed Amundson's picture of his wife and two children, said that they meant nothing to him and were "history," and threw it against the wall shattering the glass. He then said again that he was going to kill them. Rahman indicated that he would "do this to you" forming the shape of a gun with his hand. He also said that he knew people that he could pay $2,000 to break Amundson's kneecaps, and that he would do that.[3]

Judi Hansen similarly testified that Rahman erupted into an angry, profanity-laced tirade, that he picked up a chair, that he threw the picture of Amundson's family against the wall, and that he threatened Amundson and his family. The only specifics of the threats that she could recall at trial was the threat that Rahman could pay someone $2,000 to break

---

[2]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes same solely as background to the issues presented in this case, and it does not summarize all such material. No statement of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence in this overview does not signify that the Court has overlooked the evidence in considering petitioner's claims.

[3]ECF No. 27-13, at 8-9, 17, 20-21 & 29-30. All page citations are to the CM/ECF generated electronic document page number, not to any page number in the original transcript or document.

Amundson's knees and the implied threat of Rahman forming the shape of a gun with his hand and holding it to his head. She testified that she was "shocked," "astonished," "scared . . . absolutely," "shaken," and "rattled" at the time and thus did not have a better recall of more specifics of the threats. She remembered the "enormity of [his] anger" and that "he was absolutely threatening." She testified that "[w]hat was absolutely vivid to me was being trapped in that office." She therefore sought to get the office door open and to get Rahman out of the office to where more employees were present, hoping that he would calm down.[4]

John Amundson's administrative assistant, Arlene Henrikson, first heard a loud boom and crashing noise coming from Amundson's office. According to her testimony, the door then flung open and Rahman came "storming out," "dark with anger" and spouting obscenities. She heard Rahman threaten Amundson that he could have his kneecaps broken for $2,000. She called 911. When she looked in Amundson's office "everything that was on his little round conference table was smashed and broken, including the picture – of his kids."[5]

Amundson's partner, James Main, had a corner office at the other end of the building. According to Main's testimony, he heard the commotion coming from the direction of Amundson's office, and his assistant said to him that he better get down there. As he approached, he observed that Rahman "was very upset and mad" and was "using profanities about being fired." When Main tried to calm him down, Rahman threatened him. Rahman formed a gun with his hand, pointed it at Main's head, and said that he could have him killed for $2,000. He then also said that for $2,000 he could have his knees broken.[6]

The firm's personnel ultimately succeeded in getting Rahman to return his electronic office key and leave the building. Main trailed Rahman out to make sure that he did not vandalize any employee vehicles in the parking lot. (E.g., ECF No. 27-16, at 6 & 17.)

---

[4]ECF No. 27-13, at 55-56 & 61-63. See also *id.*, at 68 (less specific corroborating testimony by Alice Teevens as to what she was able to hear from the next office).

[5]ECF No. 27-16, at 5-6 & 10-11; *see also* ECF No. 27-13, at 68 (less specific corroborating testimony by Teevens as to what she could hear from her office).

[6]ECF No. 27-16, at 16 & 26-29.

-3-

The next day, Wednesday, November 8, 2006, John Amundson received a call from Rahman at the office. According to Admundson's testimony, Rahman wanted to rescind the background investigation authorization that he gave the firm during the hiring process. Amundson said that he would see what he could do. He then said that he was upset about the prior day's events. Rahman responded that he meant every word of what he had said and that "I'm coming to f–king get you guys."[7]

Amundson contacted the police again, and the firm hired a private security guard.[8]

The firm was located in a two-story office building at the corner of Indigo Drive and Park Run Drive. Indigo runs north-south, and Park Run runs basically east-west.[9]

The office building was located on the southeast corner of the intersection. The west side of the building paralleled and was adjacent to Indigo, with no other intervening large structures between the building and the street. The building was set down into a dip or depression, such that a straight line drawn from street level on Indigo would intersect the building approximately eight feet up on the exterior of the first floor.[10]

The firm occupied the second floor. A stairwell was located at the southwest corner of the building, with a second-story window facing west.[11]

John Amundson's office was immediately to the north of the stairwell, also with a window facing west and overlooking Indigo.[12]

James Main's office was located at the other end of the building, at the northwest corner overlooking both Indigo and Park Run. (ECF No. 27-16, at 17-18.)

---

[7]ECF No. 27-13, at 10-11 & 21-22.

[8]E.g., ECF No. 27-13, at 11.

[9]ECF No. 27-13, at 4 & 36; ECF No. 27-16, at 17-18. The intersection is a short distance to the east of the major intersection between West Charleston Boulevard and South Town Center Drive. The north-south Indigo directly connects the east-west Park Run and Charleston thoroughfares.

[10]ECF No. 27-13, at 26 & 34.

[11]ECF No. 27-13, at 5, 14 & 23-25 .

[12]ECF No. 27-13, at 12.

1    At approximately 10:45 a.m. on the morning of Thursday, November 9, 2006, John
2    Amundson was in his office, leaning back in his chair on the telephone.  He heard a loud
3    popping sound which made him think initially of rocks hitting the exterior of the building.  Then
4    as he sat up he saw bullet holes in his window.  As he admitted unwisely, he looked out the
5    window, which faced west overlooking Indigo.  He saw Lusan Rahman's car stopped on
6    Indigo facing south with Rahman leaning out the driver's side window looking up at the
7    building, with the morning sun illuminating his face.  Hearing others in the office yelling for
8    everyone to get down, Amundson then dove for the floor.[13]

9    Arlene Henrikson testified that she was in CPA Alice Teevens' office talking to Teevens
10   at approximately the same time.  Teevens' office was the next office, with the next west-facing
11   window, to the north of Amundson's office and window.  Henrikson was standing at Teevens'
12   desk facing toward the window.  She heard a succession of gunshots, and when she looked
13   out the window she saw "poofs of smoke" coming from the area of what she recognized to be
14   Rahman's green car.  She did not look long enough to see who was in the vehicle because
15   she also dove for the floor.  She then crawled out into the hallway and called 911.[14]

16   James Main testified that at approximately the same time, he was sitting at his desk
17   in his corner office, which had his body oriented facing south.  After he heard several
18   gunshots, he looked out his west-facing window that overlooked Indigo.  He saw Rahman's
19   vehicle driving slowly southward on Indigo.[15]

20   According to his testimony, Main ran out of his office yelling for everyone to get down,
21   and he began a call to 911 until he learned that Henrikson already was on the line with 911.

22

23   _____

24   [13]ECF No. 27-13, at 12-14, 23, 26-27, 31-33 & 35.  During his brief look, Amundson did not see a
     gun; and he thought initially that someone else also may have been in the car with Rahman.

25   [14]ECF No. 27-16, at 6-9 & 12.  Teevens testified, consistently with Henrikson, that as she looked out
     the window as she was going to the floor she saw a dark greenish-blue car paused facing southbound on
26   Indigo.  She saw "darkness in the window" of the vehicle (which other testimony reflected was untinted, ECF
     No. 27-15, at 6), but she did not make out an actual figure inside the vehicle window during her abbreviated
27   observation.  She also did not see anyone standing outside the vehicle.  ECF No. 27-13, at 69-71.

28   [15]ECF No. 27-16, at 17-18.

Only a few minutes later, as firm personnel were checking on everyone and watching to see if Rahman was going to come back, the receptionist told Main that Rahman was calling for him. When he took the phone, Rahman told him that "the next bullet was for me, and that if I put $100,000 in his bank account, he would cancel my bullet."[16]

Fearing for his family, Amundson had his children pulled from school and escorted to the office after the police arrived; he subsequently was able to reach his wife; and they all sheltered in place at the office with the firm's personnel. Everyone stayed inside at the office for another three hours until Rahman was in custody.[17]

Seven bullet holes were found in the building by the crime scene analyst after the shooting. Bullets collected in or from the building and the casings recovered were for a large caliber round, specifically .45 ACP caliber rounds.[18]

One of the large caliber bullets penetrated the western exterior wall to John Amundson's office and then passed completely through his computer monitor. Amundson testified that if he had been sitting up working at his computer rather than leaning back talking on the phone, he would expect that the bullet would have hit him in the head. According to his testimony, the path of the bullet was in line with where he typically would have been sitting while doing accounting work at the computer.[19]

Two bullets passed through Amundson's office window, and another bullet hit the stucco exterior several feet below his window. According to his testimony, one of the bullets that passed through the window made a "pretty big hole," then passed across the location of two guest chairs, passed "cleanly" through the opposite wall, went through the area where Henrikson sat, hit the ceiling in the area beyond that, and then hit the opposite wall on the far

---

[16]ECF No. 27-16, at 18-20 & 32-35. Notably, Rahman called Main, the partner at the other end of the building, not Amundson, the partner who worked inside the office at the end of the building into which he had just fired multiple shots.

[17]ECF No. 27-13, at 15 & 28.

[18]ECF No. 27-13, at 42 & 46-49; ECF No. 27-15, at 9, 32-34 & 37.

[19]ECF No. 27-13, at 13-14 & 25 (Amundson); *id.*, at 48-49 (crime scene analyst).

side of the office. Judi Hansen testified that a bullet hole in Amundson's window was "about halfway up" the window, such that it would have hit her in the head if she had been standing "[w]here I always stand."[20]

Arlene Henrikson testified that a bullet that penetrated through the interior wall then "reflected" off the ceiling tiles and bounced into the conference room. According to her testimony, "it would have been a head shot to me" if she had been standing there or walking around the corner at the time.[21]

Three more bullets hit the exterior of the stairwell that was immediately adjacent to Amundson's office. Two passed through the west-facing stairwell window. One then struck the east interior wall leaving a pock mark on the east exterior wall of the building. The other passed through the ceiling tiles. The third bullet lodged in the steel frame of the west-facing window. Amundson testified that these bullets struck or passed "only a matter of a few feet" from where he was sitting at the time.[22]

None of the bullets hit the exterior of the roof of the building.[23]

The crime scene analyst recovered six ejected casings on Indigo in the southbound lanes. Inside, he recovered one bullet next to the conference room door on the second floor. The police later recovered a second bullet from Amundson that he indicated that he found behind the door in his office after the crime scene analyst had left.[24]

Rahman was arrested later on the day of the shooting after he drove up in the green Toyota back at his apartment complex, where the police had been waiting for him. (ECF No. 27-15, at 12-14 & 20.)

---

[20]ECF No. 27-13, at 13-14 & 23-24 (Amundson); *id.*, at 48-49 & 50-51 (analyst); *id.* at 58 (Hansen).

[21]ECF No. 27-16, at 8.

[22]ECF No. 27-13, at 14 & 23-26 (Amundson); *id.*, at 41-42, 46-48 & 50 (analyst). See also ECF No. 27-16, at 19 & 31-32 (James Main refers to the bullets hitting the stairwell walkway "behind [Amundson's] office that's probably like two feet from where he sits").

[23]ECF No. 27-13, at 31.

[24]ECF No. 27-13, at 37 & 39-41; ECF No. 27-15, at 14 & 22.

Rahman's brother consented to a search of the car, which was registered in his name. The police recovered: (1) two ejected .45 ACP casings on the passenger floorboard; (2) a Tanfoglio .45 ACP semiautomatic pistol inside a gun case that was under the front passenger seat; (3) a box of .45 ACP cartridges in the glove box, with 27 of the original 50 remaining; and (4) a pair of gloves, one from the driver's seat and the other from the glove box.[25]

The firearms and tool marks expert testified that the markings made from firing and ejection of test rounds matched those on the eight casings recovered. He further testified that the rifling impressions made on bullets expended during test firing matched those on the two bullets recovered from the crime scene. That is, the bullets recovered from the scene were fired from the Tanfoglio .45 recovered from the vehicle that Rahman was driving.[26]

A fingerprint matching one of Rahman's fingerprints was recovered from the plastic holding the rounds in the ammunition box.[27]

Lusan Rahman testified at trial.

Rahman admitted that he shot the Tanfoglio .45 at the Main Amundson offices on November 9, 2006. He admitted specifically that he fired the shots that produced the bullet holes testified to by the State's witnesses.[28]

He testified at one point that "I got out, and I sprayed my gun toward – and toward the roof mainly . . . [but] I did it so fast, I guess – I guess some bullets went through the windows," which he attributed to "bad aim."[29]

However, only shortly thereafter, he testified, on direct, as follows:

---

[25]ECF No. 27-15, at 6-9 & 11. The Tanfoglio .45 was loaded with seven rounds in the magazine when found by the police. As configured when found by police, with seven rounds loaded in the magazine, the weapon was ready to be fired upon chambering a round from the magazine. The casings, the rounds in the loaded gun, and the rounds in the ammunition box all were the same brand and type of ammunition.

[26]ECF No. 27-15, at 33-34.

[27]ECF No. 27-15, at 15.

[28]ECF No. 28, at 29-30, 37-38 & 43. Exhibit 48 is accessed on CM/ECF via the first unnumbered link within ECF No. 28. Rahman already had made partially inculpatory post-arrest statements to the police.

[29]ECF No. 28, at 38.

| | |
|---|---|
| Q | Did you take any purposeful shots – intentional shots at the glass? |
| A | Maybe, I think so I did.  I just aimed up, and I was aiming - at the glass.  No.  I mean, I just probably break – oh, I probably wanted to break a couple of glasses, possibly.  I don't - I didn't know what I was thinking.  I don't remember. |

ECF No. 28, at 38.[30]

Rahman admitted on cross that he knew that Amundson would be in his office on that date.  He later testified that he "guess[ed]" that he fired at that specific side of the building because "Mr. Amundson was there," in order to "kind of send my message toward him I guess."  He ultimately admitted that he fired the bullets into the "area" of his office.[31]

He denied, however, that he aimed for Amundson:

| | |
|---|---|
| Q | You didn't – |
| A | I didn't aim for him.  I just – you know, I thought he would be behind the wall.  If anything, came close, hit the wall, I mean – |
| Q | So you thought he was just going to be behind a wall, so you could just scare him a little bit? |
| A | Yes.  Yeah.  I mean, not – yeah.  I – I just wanted to send a message, you know. |

ECF No. 28, at 43.

Rahman further admitted that he knew that the bullets could go through a window.[32]

Rahman testified that he learned to handle the gun over a year-and-a-half period while living in Texas.  They lived in open country, and he would shoot the gun out in the backyard.  He testified that he would shoot at a building, and he maintained that the shots would not go through.  He testified that the gun had "been sitting there" unused thereafter for five years.[33]  While the gun was registered to his brother at the relevant time, the brother testified that

[30]See also *id.*, at 43-44 & 53-57.

[31]ECF No. 28, at 43, 61 & 63.

[32]ECF No. 28, at 57.

[33]ECF No. 28, at 60-61 & 62-63.

Rahman had given him the gun and changed the registration over to him.[34]  The gun apparently thus had been Rahman's gun originally and for a substantial period of time, and further had remained accessible to him thereafter.  Rahman's trial testimony reflected that he was very familiar with the operation of the pistol.[35]

Rahman admitted that he became angry when he was fired on November 7, 2006, that he broke the framed picture of Amundson's family, and that he said that he could pay someone to break Amundson's kneecaps.[36]

He denied, however, threatening to kill Amundson or his family.[37]

Rahman variously admitted and denied that he made the figure of a gun with his hand and pointed it at Amundson.  He ultimately testified that he formed his hand into a purportedly different figure.[38]

Rahman admitted saying in his telephone call to Amundson on November 8, 2006, that he meant everything that he said the prior day.[39]

He maintained, however, that what he meant was that he had meant a statement the prior day that he was going to sue the firm.  He denied that he made any threats in the call.[40]

Rahman admitted calling James Main after the shooting.[41]

---

[34]ECF No. 28, at 73-74.  At the relevant time, a local ordinance required Clark County residents to register handguns with the local police, which issued a blue card reflecting the local registration.

[35]See, e.g., ECF No. 28, at 38 (lines 3-4 on original transcript page 142, stating "[u]sually I would have seven bullets in there"); id., at 41 (lines 23-24 on original transcript page 153, referring to its capacity); id., at 56 (lines 13-17 on original transcript page 215, referring, inter alia, to his "usual rack" and describing how to load an additional round in the chamber in order to load the gun with eight rounds rather than seven).

[36]ECF No. 28, at 34, 42 & 50-51.

[37]Id., at 34 & 50.

[38]Id., at 50-51.

[39]Id., at 35 & 52-53.

[40]Id., at 35-36 & 52-53.

[41]Id., at 38-39.

He denied, however, that he threatened Main and demanded money, although at one point he responded initially to a question on direct with: "No. I don't think so. No."[42]

After considering the foregoing evidence, the jury found Rahman guilty on all counts.

The Court will note any further factual particulars relevant to specific grounds in the discussion of those grounds.

### *Governing Standard of Review*

When the state courts have adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. 563 U.S. at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 563 U.S. at 181-88.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent

---

[42]ECF No. 28, at 39, 43 & 57-58.

-11-

from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g.,* *Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g.,* *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 563 U.S. at 569.

### *Discussion*

### *Ground 1: Sufficiency of the Evidence as to Attempted Murder*

In Ground 1, petitioner alleges that he was denied a right to due process of law in violation of the Fifth and Fourteenth Amendments because the evidence was insufficient to sustain the conviction for attempted murder with the use of a deadly weapon. He urges that there was insufficient evidence of a deliberate intent to kill on his part.

-12-

The state supreme court rejected the claim presented to that court on the following basis:

> Rahman first contends that the evidence presented at trial was insufficient to support the jury's finding of guilt of attempted murder. Specifically, Rahman contends that the only evidence presented that he possessed the specific intent to kill was testimony improperly elicited by the State and admitted by the district court. Specifically on direct examination, a detective commented that he believed Rahman was "minimizing" his actual intent when he stated that he was merely trying to "scare" his ex-employers by shooting into the office building.
>
> Our review of the record on appeal, however, reveals sufficient evidence to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. In particular, we note that the victim testified that he was sitting in his office during work hours when Rahman shot six times into the building. One bullet hit his computer. Rahman testified, admitting that he shot into the building during office hours when he knew employees were present.
>
> The jury reasonably could infer from the testimony presented that Rahman attempted to murder the victim. It is for the jury to determine the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports the verdict.
>
> Further, to the extent that Rahman claims the district court erred in admitting testimony that Rahman was "minimizing" his intent, we note Rahman did not object to the admission of this testimony. Failure to raise an objection in the district court generally precludes appellate consideration of an issue absent plain error affecting substantial rights. Generally an appellant must show that he was prejudiced by a particular error in order to prove that it affected his substantial rights. Given the evidence presented at trial, we conclude that Rahman failed to demonstrate that the admission of the detective's testimony affected his substantial rights.

ECF No. 11-1, at 37-39 (citation footnotes omitted).

The state supreme court's rejection of the insufficient evidence claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

On a challenge to the sufficiency of the evidence, the habeas petitioner faces a "considerable hurdle." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003). Under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979), the jury's verdict must stand

if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *E.g., Davis*, 333 F.3d at 992. Accordingly, the reviewing court, when faced with a record of historical facts that supports conflicting inferences, must presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution, even if the resolution by the state court trier of fact of specific conflicts does not affirmatively appear in the record. *Id.* The *Jackson* standard is applied with reference to the substantive elements of the criminal offense as defined by state law. *E.g., Davis*, 333 F.3d at 992. When the deferential standards of AEDPA and *Jackson* are applied together, the question for decision on federal habeas review thus becomes one of whether the state supreme court's decision unreasonably applied the *Jackson* standard to the evidence at trial. *See, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

This Court has summarized trial evidence relevant to the sufficiency of the evidence at length.[43]

On the one hand, the jury had before it: (1) testimony by John Amundson that Rahman made multiple threats directly to him during a violent rage on November 7, 2006, including that he would kill Amundson and his family; (2) testimony by Judi Hansen that she recalled that Rahman was violent, angry and threatening and that he threatened to have someone break Amundson's kneecaps and formed a gun with his hand, but that she had been so shaken by the experience at the time that she was unable to recall further specifics; (3) corroborating testimony by multiple other witnesses as to Rahman's angry rage; (4) testimony by James Main that Rahman also threatened, *inter alia*, his life during the same overall incident; (5) testimony by Amundson that Rahman stated during a telephone call the next day that he had meant everything that he had said and that he was "coming to f–king get you guys;" (6) substantially irrefutable proof that Rahman fired seven shots with a large caliber semiautomatic pistol during business hours not into or around the roof of the office building

---

[43]See text, *supra*, at 2-11.

but instead within feet of where Amundson typically worked, including one shot that hit and penetrated essentially dead center at where Amundson typically would have been sitting at his computer workstation; (7) testimony by Main that Rahman called him a few minutes after shooting multiple bullets into the immediate area of Amundson's office to tell Main that the next bullet would be for him if he did not pay Rahman $100,000; and (8) evidence that Rahman had experience shooting the large caliber firearm that he used, which originally had been owned by him. The evidence, over and above that bearing on intent, further left no room for doubt that Rahman was the shooter.

On the other hand, the jury had before it Rahman's equivocal, inconsistent, and contradictory self-serving trial testimony and statements to the police, admitting to what in the main could not be refuted and denying more extensive culpability. Rahman testified at trial variously that he fired his gun toward the roof mainly but he guessed that some bullets went through the windows due to bad aim, that he aimed at the window glass because he "probably" wanted to break the glass but he did not remember or know what he was thinking, and finally that he thought that Amundson would be behind the exterior wall that as a matter of fact he fired into and that he fired the bullets into the area of his office to send a message.[44]

The jury thus had before it, on the one hand, testimony as to threats by Rahman to kill Amundson and strong circumstantial evidence based upon where he fired seven bullets from a large caliber weapon and, on the other, multiple equivocal and contradictory statements by Rahman as to where he was aiming and why.

It was within the province of the jury to follow the very clear trail left by his bullets, after he previously had threatened to kill Amundson, rather than his words after the fact.

Petitioner nonetheless urges that the only evidence of Rahman's specific intent to kill Amundson was a detective's testimony that he believed that Rahman was minimizing his intent and involvement in his statements to the police. The Court is not persuaded that such

---

[44]See text, *supra*, at 8-9. Defense counsel testified at the state post-conviction evidentiary hearing that he advised Rahman to not testify and that he specifically advised him that inconsistent testimony would pose problems for his defense. See ECF No. 29-13, at 13-17 & 29-31.

is the case.  First, the jury did not need this testimony from the detective to draw a permissible

inference in assessing Rahman's credibility that he potentially was seeking to minimize his

intent and culpability in his statements and testimony.  Rahman's own equivocal, inconsistent,

and contradictory trial testimony provided ample basis from which to draw such a permissible

inference.  Second, more to the point, the jury quite properly could infer specific intent from

(a) Rahman's express threats to kill Amundson followed by (b) his actions in firing seven large

caliber rounds all striking within feet of the area where Amundson normally would be sitting

during office hours, including exactly where he would be sitting.  Petitioner simply rules out,

without any apposite supporting citation, the jury's ability to infer the required express malice

from circumstantial evidence.   Under Nevada state law, the express malice required to

support a conviction for attempted murder quite clearly can be inferred from circumstantial

evidence.  *E.g., Washington v. State*, 376 P.3d 802, 808-09 (Nev. 2016)(the express malice

required for attempted murder could be inferred from circumstantial evidence where the

defendant fired a handgun six to seven times into an inhabited apartment at 4:35 a.m.).

　　　　Ground 1 accordingly does not provide a basis for federal habeas relief.[45]

_____

[45]On federal habeas review, petitioner does not continue to intertwine with this claim an argument that the trial court erroneously admitted testimony as to Rahman "minimizing" his involvement.  Under *Jackson*, a reviewing court must consider all of the evidence presented at trial, regardless of whether particular evidence allegedly was admitted erroneously.  *McDaniel v. Brown*, 558 U.S. 120, 130-31 (2010).

　　　　Petitioner seeks to draw competing inferences from the alleged initial police assessment of the significance of Rahman's first threats on November 7, 2006.  Petitioner alleges that the investigating detective's testimony reflects that "Rahman's statements [on November 7, 2006,] were not taken seriously enough by the police to spur any further investigation" and that there thus was no evidence of specific intent prior to the shooting.  ECF No. 26, at 15.  The detective testified, however, that he *had not been aware* of the November 7, 2006, specific threats to kill at the time of the charging recommendation.  See ECF No. 27-15, at 18 (original transcript page number 64, lines 8-22).  He did not assess that of which he was not aware.

　　　　Petitioner further points to the State's dismissal of a charge of attempting to murder Main.  The dismissal of this charge has no relevance to any exhausted material issue herein.  However, the most likely reason that the charge was later dropped was that the prosecution ultimately concluded that, while Main was in the building at the time of the shooting, his office was over 60 feet away at the other end of the building from where Rahman fired his shots.  Rahman fired into Amundson's office, not Main's.

　　　　In all events, such debating points as to competing inferences that perhaps could be drawn from the trial evidence are at best fodder for closing argument, not for a successful challenge to the sufficiency of the
(continued...)

### Ground 2: Alleged Prosecutorial Misconduct

In Ground 2, petitioner alleges that he was denied rights to due process and a fair trial in violation of the Fifth and Fourteenth Amendments when the State did not produce an audiotape of Rahman's November 9, 2006, call to James Main until late in the trial after Main already had testified.

As backdrop, Main testified at trial that Rahman called him a few minutes after Rahman fired multiple shots into the area of John Amundson's office. According to Main's testimony, Rahman told Main that the next bullet would be for him unless he paid Rahman $100,000.[46]

Main gave substantially the same testimony on this point at the November 28, 2006, preliminary hearing. He testified also at that time (as well as substantially similarly at trial) that Arlene Henrikson handed him a small portable tape recorder during the call, that he recorded the remainder of the call from Rahman, that he handed the phone and tape recorder back to Henrikson after the call, and that he believed that Detective Mayo with the police took the tape later that afternoon.[47]

It does not appear that the tape was introduced into evidence at trial by either party. Nor was a defense objection or request for relief made with regard to the tape.

---

[45](...continued)
evidence under *Jackson.* "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. After AEDPA, the Court must apply the *Jackson* standard "with an additional layer of deference." *Juan H. v. Allen*, 408 F.3d at 1274. What the police may or may not have known or thought at a particular time, and their alleged bases for charging recommendations, clearly did not circumscribe the inferences that the jury permissibly could draw from the actual evidence presented at trial.

At bottom, an assailant with a .45 caliber pistol cannot insulate himself from potential culpability for attempted murder as a matter of law simply by saying that he did not mean to kill the person in the office into which he fired multiple shots. That fact that petitioner was convicted after presenting such a narrative to the jury does not give rise to a viable insufficient evidence claim under *Jackson.* At the very least, the state supreme court's rejection of such a claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

[46]See text, *supra*, at 5-6.

[47]ECF No. 27-7, at 13-14 & 15. See also ECF No. 27-16, at 20, 33 & 34-35 (trial testimony).

On direct appeal, Rahman's fast track statement asserted as follows in pertinent part:

> . . . . While at first the prosecution told Mr. Rahman's counsel that they did not have possession of the tape and did not know what had happened to it, the tape was produced near the end of the five-day trial. (See attached affidavit of Conrad Claus.)
>
> . . . . .
>
> The basis for the attempt murder charge was, to a significant extent, the phone conversation between Mr. Rahman and Mr. Main on November 9, 2006, subsequent to Defendant having shot at the building. (Transcript, Day 3, V. 2, pp. 63-64) Mr. Main recorded that conversation and gave the tape to the police. The tape, however, as important as it was to the proceedings, was not turned over to Defendant's counsel until late in the trial, after Mr. Main had already testified. (See, attached affidavit of Conrad Claus).
>
> . . . . .
>
> Here, Defendant's counsel planned his defense strategy based on the assumption that the tape was, in fact, unavailable. He had no opportunity to listen to the tape prior to trial or even prior to most of the questioning of pertinent witnesses. The November 9, 2006 telephone conversation between Mr. Main and Mr. Rahman was a crucial part of the attempt murder case. Yet, Defendant was denied access to the tape of it until it was too late for his attorney to evaluate the tape and plan a defense strategy and approach that took the tape's contents into account. Thus, he was placed at an unfair advantage. As the tape was in possession of the prosecution team from the time it was obtained by the police, the failure to turn it over to defense counsel, on the erroneous grounds that it was "missing" was clear, prejudicial misconduct.

ECF No. 11-1, at 15 & 19-20.

No Claus affidavit is attached to the copy of the fast track statement filed with the state court record exhibits in this matter.

The State's fast track response reflected that no Claus affidavit was attached with the copy of the fast track statement received by counsel for the State at that time.[48]

In the federal amended petition, counsel asserted that counsel to date had "not been able to locate a copy of the referenced 'affidavit.'" Counsel reserved the right to supplement the exhibits if a copy was located. No such copy has been filed. (ECF No. 26, at 17 n.6.)

_____

[48]ECF No. 11-1, at 31 n.3. The State contended that the Claus affidavit in any event would provide details outside the trial record, with regard to a matter that was not presented to the trial court in the first instance.

It has not been demonstrated by petitioner, who has the burden of proof on federal habeas review, that the Claus affidavit actually was a part of the record presented to the Supreme Court of Nevada on direct appeal. The most probable inference from the record presented to this Court is that it was not.

No evidence was presented to the Supreme Court of Nevada in the record on direct appeal that the tape contained exculpatory information.

No evidence was presented to the Supreme Court of Nevada in the record on direct appeal that the tape contained impeachment information.

Nor does it appear that any evidence was presented to the Supreme Court of Nevada in the record on direct appeal whatsoever as to the actual content of the tape, one way or the other in terms of being useful to either the State or defense.

The Supreme Court of Nevada rejected the claim presented to that court on direct appeal on the following basis:

> . . . Rahman contends that the prosecutor committed prejudicial misconduct. Specifically, Rahman contends that the prosecutor did not produce a tape-recorded telephone conversation of Rahman threatening an ex-employer until near the end of trial. Rahman argues that the audiotape was a crucial part of the attempted murder case, and yet his attorney was denied access until it was too late to evaluate the tape and plan a defense strategy. Rahman failed to object to this in the proceedings below. Failure to raise an objection in the district court generally precludes appellate consideration of an issue absent plain error affecting substantial rights. Generally, an appellant must show that he was prejudiced by a particular error in order to prove that it affected his substantial rights. Rahman did not provide an adequate factual record or sufficient cogent argument to demonstrate error that is plain on the record.

ECF No. 11-1, at 39 (citation footnotes omitted).

Petitioner has not carried his burden on federal habeas review of demonstrating that the state supreme court's rejection of this claim on direct appeal was either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or was based upon an unreasonable determination of fact "in light of the evidence presented in the State court proceeding" under § 2254(d).

/ / /

-19-

1   No actual record evidence was presented to the Supreme Court of Nevada on direct

2   appeal as to the circumstances of the alleged late production of the tape.

3   Moreover, as noted, no record evidence was presented to the Supreme Court of

4   Nevada on direct appeal that the tape contained exculpatory evidence such as would give rise

5   to a potential claim under *Brady v. Maryland*, 373 U.S. 83 (1963).

6   No record evidence was presented to the Supreme Court of Nevada on direct appeal

7   that the tape contained impeachment evidence such as would give rise to a potential claim

8   under *Giglio v. United States*, 405 U.S. 150 (1972).

9   No record evidence was presented to the Supreme Court of Nevada on direct appeal

10  in any respect as to the actual content of the tape.

11  Petitioner has not presented this Court with any apposite Supreme Court precedent

12  establishing that alleged late production during trial of a piece of evidence that neither party

13  used thereafter deprives a defendant of due process because it denies defense counsel the

14  opportunity to evaluate the evidence and plan a defense strategy taking its – wholly

15  unspecified to the reviewing court – content into account.  Nor is the Court aware of any

16  Supreme Court precedent upholding such a bare claim with no showing of materiality.

17  The Court further has no difficulty concluding that the state supreme court's rejection

18  of this factually unsubstantiated claim on direct appeal was not an unreasonable application

19  of the general due process standard applicable to prosecutorial misconduct claims.[49]

20  In the federal reply, petitioner seeks to rely on testimony by defense counsel at the

21  state post-conviction evidentiary hearing, four years after the state supreme court's decision

22  on the merits of this claim on direct appeal.  This testimony was not in the record before the

23

24  _____

25  [49]On federal habeas review of a state court conviction for constitutional error, the standard of review
    for a claim of prosecutorial misconduct, is "'the narrow one of due process, and not the broad exercise of
    supervisory power'" applied in federal criminal trials.  *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 181
26  (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).  "The relevant question is whether the
    [alleged misconduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due
27  process.'"  *Id*. (quoting *Donnelly*, 416 U.S. at 643).  *Accord Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir.
    1995).  Petitioner's conclusory showing to the Supreme Court of Nevada on this claim on direct appeal fell far
28  short of this mark.

Supreme Court of Nevada on direct appeal when it decided this claim on the merits, and it is that decision that petitioner challenges in Ground 2 on federal habeas review.[50] This Court therefore cannot consider the testimony in reviewing petitioner's challenge to the direct appeal decision on the merits. *See Pinholster*, 563 U.S. at 181-82 (review of a state court decision under § 2254(d)(1) is limited to the record that was before the state court at the time that the court adjudicated the claim on the merits).

Ground 2 accordingly does not provide a basis for federal habeas relief under the governing standard of review in AEDPA.[51]

_____

[50]See ECF No. 37, at 10, lines 16-23.

[51]The cited state post-conviction hearing testimony in any event would not lead to a different outcome even if the matter instead were postured for a *de novo* review in federal court. Petitioner points to defense counsel's testimony that he "became aware of" the tape "late in the process." ECF No. 29-13, at 19. Defense counsel of course in fact would have been "aware" of the existence of the tape virtually from the outset because it was the subject of testimony at the preliminary hearing, at which he represented Rahman. See text, *supra*, at 17. The testimony added nothing in that respect to the already conclusory presentation to the state supreme court on direct appeal regarding an alleged "late disclosure" of the actual tape itself by the State. Petitioner further relies on defense counsel's testimony that "it was pretty heavy evidence." ECF No. 29-13, at 20. Such conclusory testimony similarly added nothing specific regarding the actual content of the tape to the bare record presented to the Supreme Court of Nevada on direct appeal. Moreover, later in the same testimony, defense counsel testified that he was familiar with the content of the tape; that the State agreed not to introduce the tape at trial, apparently because of the late production to the defense; *and that he was relieved that it did not make it into evidence because it inculpated his client. Id.*, at 33-36 & 39-42. See also *id.*, at 53-55 (the prosecuting attorney's representations as to what led to the late production of the tape).

There is a transcript apparently of the audible portions of the tape in the federal record, which similarly does not appear to have been in the record on the state court direct appeal. See ECF No. 29-21. The transcript obviously picks up during an ongoing conversation, which is consistent with Main's testimony tending to establish that the tape did not cover the entire conversation. The tape transcript – when viewed in the context of the Court's review of the full trial record – contains no exculpatory evidence under *Brady* and no material impeachment evidence under *Giglio*. Nor is there anything in the transcript that would tend to suggest that late production of the tape would "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." If anything, the defense was fortunate that a tape tending to corroborate Main's testimony that Rahman attempted to extort $100,000 from him did not make it into evidence. At bottom, even after viewing evidence not presented to the state supreme court at the time of its decision on the merits of this claim, Ground 2 remains a claim bereft of any factual support and/or apposite supporting United States Supreme Court authority.

Petitioner further alleges in partial support of this ground that "[t]he basis for the charge of attempted murder of Amundson was, to a significant extent, the telephone conversation between Rahman and Main made on November 9th following Rahman's shooting into the building." ECF No. 26, at 16. Petitioner bases this allegation on the testimony of an investigating detective. The detective testified that attempted murder charges as to both Amundson and Main were brought initially because Rahman threatened to shoot Main in

(continued...)

-21-

***Ground 3: Effective Assistance of Counsel – Lesser Included Offense Instruction***

In Ground 3, petitioner alleges that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments when trial counsel failed to request an allegedly lesser included offense instruction on the attempted murder charge of assault with a deadly weapon and appellate counsel failed to raise the issue on direct appeal.

***Standard of Review Applicable to Ground 3***

Petitioner urged for the first time in the federal reply that the Court should consider Ground 3 *de novo* rather than under AEDPA's deferential standard of review.

As backdrop, respondents did not challenge the exhaustion of the claims in Ground 3.[52] The claims nonetheless were referred to only sparingly in the state courts, particularly in the proceedings before the state supreme court.

Petitioner did present claims in his *pro se* amended state post-conviction petition that he was denied effective assistance of counsel because trial counsel did not request a lesser included offense instruction as to attempted murder and appellate counsel did not raise the issue on direct appeal.[53]

/ / /

───────────────────

[51](...continued)
the post-shooting call and he had fired shots into an office building where both worked. The detective further testified that he was not aware at the time that the initial charges were made that Rahman had threatened to kill Amundson on November 7, 2006. ECF No. 27-15, at 18. What a detective thought about why certain charges were brought initially has nothing to do with the inferences that the jury instead could draw after considering the actual trial evidence. Regardless of whether the police – as a whole – were aware of and/or initially attached significance to Rahman's threats on November 7, 2006, to kill Amundson and his family, *the jury* quite clearly could attach significance to those threats given that Rahman fired multiple shots within feet of Amundson's likely location on November 9, 2006, *after* making those threats and *before* Rahman called Main. Petitioner's premise that the November 9, 2006, extortion call was the linchpin evidence – at trial – on the charge of attempting to murder Amundson is unfounded. In truth, what initial charging recommendation was made by the police and why has no real relevance to any material exhausted issue in this case after the matter was tried to a jury on a full record. Inferences from the detective's testimony and the State's charging decisions in the case simply lead nowhere material to the disposition of the issues presented on federal habeas review, including Ground 2.

[52]ECF No. 33, at 11, line 26 ("Respondents do not contest the exhaustion of claims 1, 2, 3, 4(a) or 4(b)(7)").

[53]ECF No. 11-2, at 105-08.

State post-conviction counsel did not address the claims in his supplemental points and authorities, however.[54]

At the state post-conviction evidentiary hearing, post-conviction counsel asked trial counsel only one question, on redirect, about a lesser included offense instruction:

> Q        Okay.  Now last question.  Did you offer a lesser included offense instruction on the attempt murder?
>
> A        I do not remember.

ECF No. 29-13, at 47.  Post-conviction counsel thereupon concluded his redirect examination of trial counsel.  He did not refresh counsel's recollection with the trial record, which reflected that no such instruction was requested.  Nor did he pursue any further inquiry in that regard.

In his closing argument at the evidentiary hearing, post-conviction counsel did not provide any argument with regard to a lesser included offense instruction.[55]

In the fast track statement on the state post-conviction appeal, post-conviction counsel did not include within the statement of issues any specific reference to a failure by trial counsel to request a lesser included offense instruction or a failure by appellate counsel to raise the issue.  The statement of issues instead focused on: (a) trial counsel's failure to make contemporaneous objection as to the three issues that were raised on direct appeal; and (b) appellate counsel's failure to make a record on the third direct appeal issue.[56]

The fast track statement referred to a failure to request a lesser included offense instruction only twice.  Each time, the focus of the passing reference was on defense counsel's failures to recall at the evidentiary hearing and his alleged strategy of not objecting at trial.[57]  Petitioner presented no principled argument seeking to  support claims specifically

---

[54]ECF No. 13-2, at 23-47.

[55]ECF No. 29-13, at 49-52.

[56]ECF No. 14-1, at 76-77.

[57]ECF No. 14-1, at 76 & 81.  The hearing was held five years after the trial, and defense counsel did not review any materials before his testimony "so they would not color my memory."  ECF No. 29-13, at 9-10.

that he was denied effective assistance because trial counsel failed to request a lesser included offense instruction and appellate counsel failed to raise the issue on appeal.

The Supreme Court of Nevada affirmed the denial of post-conviction relief in a brief two-page order in which the court concluded that "the district court did not err by rejecting Rahman's ineffective-assistance claims." The court did not expressly include the claims presented now in Ground 3 within its list of contentions presented by petitioner, and the court did not otherwise expressly discuss such claims. Nor did the court state that any such claims were procedurally barred or that they were not being considered for other reasons. The order simply did not reference any such claims in any respect.[58]

On federal habeas review, petitioner did not allege in the counseled first amended petition that Ground 3 was subject to *de novo* review. Petitioner instead alleged that any contrary state court ruling was contrary to or an unreasonable application of clearly established federal law and/or involved an unreasonable factual determination, under the deferential standard of review applicable under AEDPA.[59]

Petitioner maintained for the first time in the federal reply, after respondents had answered Ground 3 under the AEDPA standard, that the ground instead was subject to *de novo* review because the state supreme court allegedly had not decided the claims on the merits.

The Court is not persuaded on the showing and arguments made that Ground 3 is subject to *de novo* review.

In *Johnson v. Williams*, 568 U.S. 289 (2013), the Supreme Court rejected the proposition that *de novo* review is automatically required whenever a state court does not expressly address a claim in a decision that discusses other claims:

> Our reasoning in [*Harrington v. Richter*, 562 U.S. 86 (2011)] points clearly to the answer to the question presented in

---

[58]ECF No. 14-1, at 104-06.

[59]ECF No. 26, at 20.

the case at hand.  Although *Richter* itself concerned a state-court order that did not address *any* of the defendant's claims [in a summary denial of relief], we see no reason why the *Richter* presumption should not also apply when a state-court opinion addresses some but not all of a defendant's claims.  There would be a reason for drawing a distinction between these two situations if opinions issued by state appellate courts always separately addressed every single claim that is mentioned in a defendant's papers.  If there were such a uniform practice, then federal habeas courts could assume that any unaddressed federal claim was simply overlooked.

No such assumption is warranted, however, because it is not the uniform practice of busy state courts to discuss separately every single claim to which a defendant makes even a passing reference.  On the contrary, there are several situations in which state courts frequently take a different course.

568 U.S. at 298 (emphasis in original).

The Supreme Court referred to, *inter alia*, two such situations where state courts often did not discuss claims referenced in passing in a party's appellate filings:

. . . [A] state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim.  Federal courts of appeals refuse to take cognizance of arguments that are made in passing without proper development. . . . .  State appellate courts are entitled to follow the same practice.

[Further], there are instances in which a state court may simply regard a claim as too insubstantial to merit discussion. . . . .  While it is preferable for an appellate court in a criminal case to list all of the arguments that the court recognizes as having been properly presented, see R. Aldisert, Opinion Writing 95–96 (3d ed. 2012), federal courts have no authority to impose mandatory opinion-writing standards on state courts, see *Coleman v. Thompson*, 501 U.S. 722, 739, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("[W]e have no power to tell state courts how they must write their opinions").  The caseloads shouldered by many state appellate courts are very heavy, and the opinions issued by these courts must be read with that factor in mind.

568 U.S. at 299-300 (additional citations and statistical reference footnote omitted).

The Supreme Court accordingly held that federal courts must apply a "strong [presumption] that may be rebutted only in unusual circumstances"[60] when presented with a state court order that does not expressly address every claim presented:

---

[60]568 U.S. at 302.

-25-

> In sum, because it is by no means uncommon for a state court to fail to address separately a federal claim that the court has not simply overlooked, we see no sound reason for failing to apply the *Richter* presumption in cases like the one now before us. When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted.

568 U.S. at 301.

In the present case, it does not appear that "unusual circumstances" are presented that would overcome the presumption required by *Williams*. The Supreme Court of Nevada simply did not expressly discuss claims as to which Rahman had made only "passing reference" in his fast track statement on the post-conviction appeal without any argument specific to the claims. Absent unusual circumstances not demonstrated here, such a common situation is subject to the *Richter-Williams* presumption.

The Court therefore reviews Ground 3 under AEDPA's deferential standard of review.[61]

**Effective Assistance of Trial Counsel**

The Court looks first to the state courts' rejection of the claim that trial counsel rendered ineffective assistance because he did not request an allegedly lesser included offense instruction on the attempted murder charge of assault with a deadly weapon.

On petitioner's claims of ineffective assistance of counsel, he must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2)

---

[61]The unchallenged assumption underlying the foregoing discussion of course is that the claims were fairly presented to the state high court on the post-conviction appeal in the first instance. That assumption would not necessarily have represented a foregone conclusion if exhaustion of Ground 3 instead had been challenged.

The Court is not persuaded that it should "look through" the state supreme court's decision instead to the state district court's decision as the "last reasoned decision" on the claims. The state supreme court's decision was not a summary denial such as would be "looked through" under *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991)("The essence of unexplained orders is that they say nothing.") The state supreme court's order instead explicitly affirmed the denial of the state petition on the merits and briefly discussed a number of specific claims. That it did not expressly address also the claims in Ground 3 does not render the order the equivalent of a one-line summary denial "say[ing] nothing." In any event, the state district court's order was no more explicit than the state supreme court's order with regard to the specific claims in Ground 3.

-26-

counsel's defective performance caused actual prejudice.  On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time.  The  court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.  On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

"Surmounting *Strickland's* high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  On the performance prong in particular, "[e]ven under a *de novo* review, the standard for judging counsel's representation is a most deferential one."  *Richter*, 562 U.S. at 105.  Accordingly,

> . . . *Strickland* specifically commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U.S., at 689–690, 104 S.Ct. 2052. The [reviewing court is] required not simply to "give [the] attorneys the benefit of the doubt," . . . but to affirmatively entertain the range of possible "reasons [defense] counsel may have had for proceeding as they did," . . . (Kozinski, C.J., dissenting).  *See also Richter, supra*, at 1427, 131 S.Ct., at 791 ("*Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

*Pinholster*, 563 U.S. at 196.  *See also Richter*, 562 U.S. at 109-10.

When the deferential review of counsel's representation under *Strickland* is coupled with the deferential standard of review of a state court decision under AEDPA, *Richter* instructs that such review is "doubly" deferential:

> . . . . The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

In the present case, on the bare record and argument presented to that court, the state supreme court's implicit rejection of the claim of ineffective assistance of trial counsel in

Ground 3 was neither contrary to nor an unreasonable application of clearly established federal law applying the performance prong of the *Strickland* analysis.

First and foremost, assault with a deadly weapon was *not* a lesser included offense of attempted murder with a dangerous weapon at the time of Rahman's offense on November 9, 2006.

Under Nevada law, an offense is a lesser included offense of a greater offense when all of the elements of the lesser offense are included within the elements of the greater offense. *E.g., Rosas v. State*, 122 Nev. 1258, 1263, 147 P.3d 1101, 1105 (2006).

Petitioner relies upon the 1994 holding in *Walker v. State*, 110 Nev. 571, 876 P.2d 646 (1994),[62] that assault with a deadly weapon under the then existing version of N.R.S. 200.471 was a lesser included offense of attempted murder with the use of a deadly weapon under this general definition of lesser included offense.

At the time of *Walker* in 1994, the relevant statutory provisions required proof of the following under Nevada law:

> . . . . "Attempt" is defined, in part, in NRS 193.330 as "[a]n act done with intent to commit a crime, and tending but failing to accomplish it." Attempted murder requires a specific intent to kill the person or persons against whom the acts in question are directed. *Graves v. State*, 82 Nev. 137, 142, 413 P.2d 503, 506 (1966). "Assault" is defined in NRS 200.471 as "*an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another*."

110 Nev. at 574-75, 876 P.2d at 648 (emphasis added).

The Supreme Court of Nevada held in *Walker* that – as so defined – assault with a deadly weapon was a lesser included offense of attempted murder with the use of a deadly weapon, on the following basis:

> . . . . The only difference in this case, then, between attempted murder with the use of a deadly weapon and assault with a deadly weapon is whether at the time of the shooting Walker intended to kill the three victims or whether he intended

---

[62]As petitioner notes, *Walker* was overruled in part on other grounds by *Rosas*, *supra*.

1   merely to injure them. Since an intent to injure is a subset of, and
2   necessarily included in, an intent to kill, and since one cannot
    intend to kill without also intending to injure, we conclude that
3   assault with a deadly weapon is a lesser included offense of
    attempted murder with the use of a deadly weapon.

4   110 Nev. at 575, 876 P.2d at 648.

5       In 2001, however, the Nevada Legislature amended the relevant portion of N.R.S.

6   200.471 to define "assault" instead as "intentionally placing another person in reasonable

7   apprehension of immediate bodily harm." *See Jackson v. State*, 291 P.3d 1274, 1279 (Nev.

8   2012).[63]

9       After the 2001 amendment, "assault" under N.R.S. 200.471 no longer was defined

10  essentially as an attempt to commit a battery. Rather, the statute, in line instead with the

11  traditional common law tortious definition of assault, required that the State prove that the

12  defendant intentionally placed another person in a reasonable apprehension of immediate

13  bodily harm.[64]

14      As the Supreme Court of Nevada concluded in *Jackson*, assault with a deadly weapon

15  – as defined after the 2001 amendment to N.R.S. 200.471 – did not constitute a lesser

16  included offense of attempted murder with a deadly weapon. Quite simply, intentionally

17  placing another person in reasonable apprehension of immediate bodily harm is not an

18  element of attempted murder. As the court elaborated in *Jackson*, "murder can be attempted

19  secretly, with the intent – indeed, the hope – that the victim will never apprehend danger;

20  assault . . . punishes the opposite."[65]

21

22      [63]A disjunctive alternative definition was added in 2009 that was more similar to the pre-2001
23  definition, stating that assault also could be committed by "[u]nlawfully attempting to use physical force
    against another person." *See Jackson*, 291 P.3d at 1280 n.5. Rahman committed his offenses on November
24  9, 2006. Neither the post-2009 alternative definition nor the pre-2001 definition of assault in N.R.S. 200.471
    applied to his case.

25      [64]*See generally United States v. Dupree*, 544 F.2d 1050, 1051-52 (9th Cir. 1976).

26
27      [65]291 P.3d at 1280. The opinion states "assault as charged in Jackson." The court made the
    reference because the opinion addressed two appeals, one by Jackson and the other by Garcia. Only
    Jackson's case involved an assault charge. The court was not drawing a distinction as to the particular
28                                                                                          (continued...)

-29-

The state supreme court decided *Jackson* in 2012, prior to its 2013 decision affirming the denial of Rahman's state petition on the merits. Moreover, the change in Nevada law – and the resulting change in the application of Nevada's clearly-established lesser-included-offense test – was operative when the statute was amended in 2001, approximately five years before Rahman's November 9, 2006, offense. The 1994 holding in *Walker* clearly no longer was good law in 2006 because the holding was based upon statutory language that had been repealed and replaced with an entirely different definition of assault under Nevada law.

In the present case, it therefore was not deficient performance for trial counsel to not request a lesser-included-offense instruction on an offense that in fact was not a lesser included offense under the Nevada law that was applicable to the 2006 offense.[66]

In any event, even if assault with a deadly weapon *had* constituted a lesser included offense of attempted murder with a deadly weapon at the relevant time, petitioner failed to establish in his showing to the state courts that trial counsel rendered deficient performance.

The state supreme court was presented, at best, with a bare claim unsupported by any significant record development or apposite argument and supporting citation. For factual development, petitioner presented only a single response to a single question where defense counsel did not recall – five years after trial with no file review or other preparation for the evidentiary hearing – whether he requested a lesser included offense instruction. Such a failure to recall years after the fact does *not* tend to establish that counsel was not aware of the possibility of an alleged lesser included offense instruction at the time of the trial, that he did not consider the possibility, or that he did not make a strategic decision to not seek an alleged lesser included offense instruction for assault with a deadly weapon.

---

[65](...continued)
manner in which the relevant offenses were charged in Jackson. In any event, in both Jackson's case and Rahman's, the victim was contemporaneously aware of the threat presented by the alleged attempted murder. See 291 P.3d at 1276.

[66]*See, e.g., Peck v. State*, 116 Nev. 840, 845, 7 P.3d 470, 473 (2000), *overruled on other grounds by Rosas,* 122 Nev. at 1269, 147 P.3d at 1109 (defense not entitled to an instruction on an only lesser related offense); *accord Hopkins v. Reeves*, 524 U.S. 88 (1998)(state trial courts, even in capital cases, are not constitutionally required to instruct juries on lesser related offenses).

-30-

Particularly when presented with only such a bare record, controlling Supreme Court precedent requires that the court must "affirmatively entertain the range of possible 'reasons [defense] counsel may have had for proceeding as [he] did.'" *Pinholster*, 563 U.S. at 196.

In that regard, long-established law recognizes that defense counsel may make a legitimate strategic decision to forgo an alleged lesser included offense instruction in order to force the jury into an "all-or-nothing" decision between conviction and an outright acquittal on the greater offense. *See, e.g., Bashor v. Risely*, 730 F.2d 1228, 1241 (9th Cir. 1984)(pre-AEDPA *de novo* review).

Moreover, inclusion of assault with a deadly weapon as an alleged lesser included offense would have been potentially problematic for the defense in the present case. As referenced above, assault with a deadly weapon also was a specific intent crime under Nevada law at the relevant time. A conviction for this offense would have required that the jury find that, *inter alia,* Rahman "[i]ntentionally plac[ed] another person in reasonable apprehension of immediate bodily harm." N.R.S. 200.471(1)(a)(2). Inclusion of this offense as a lesser included offense effectively would be suggesting to the jury that they permissibly could find that Rahman *intentionally* placed Amundson in a *reasonable apprehension* of *immediate* bodily harm – *i.e.*, of then actually being hit by one or more bullets – when Rahman fired seven large caliber rounds within feet of where Amundson was located during office hours. Any suggestion that the jury could infer from the circumstantial evidence presented that Rahman fired the bullets where he did to *intentionally* place Amundson in a *reasonable apprehension* of *immediately being hit* by one or more of the bullets risked coming perilously close to allowing that the jury instead simply could infer from the evidence that Rahman's own mental state satisfied the requisite specific intent to kill required for attempted murder.[67]

/ / /

---

[67] *Cf. Washington*, 376 P.3d at 808 (the express malice required for attempted murder could be inferred from circumstantial evidence where the defendant fired a handgun six to seven times into an inhabited apartment given, *inter alia*, that "[d]ue to the nature of the structure, a residential building in a populated area of town, and the time of day, 4:35 a.m., the jury could infer that Washington knew or reasonably should have known that the apartment was occupied").

Asking a jury to engage in such nuanced hair-splitting over specific intent – at least favorably to the defense – was especially problematic in the present case given Rahman's equivocal, contradictory and inconsistent testimony at trial.[68]  The defense ran a substantial risk after Rahman's testimony that yet further attempts to nuance what he intended with alternative possibilities in closing argument would result in a jury rejecting all such attempts at nuance for a very simple, apparent and arguably obvious inference.  That simple inference being that Rahman intended to kill Amundson when he fired seven bullets within feet of where Amundson was sitting – including exactly where he normally would be sitting – in his office during business hours, after having expressly threatened to kill him.  After Rahman's contradictory testimony, a closing argument that he simply had no specific intent at all relevant to the charged attempted murder offense had much to commend it in at least trying to get the defense presentation back on message on this core defense theory of the case.

In this same vein, the already charged lesser related offenses of discharging a firearm out of a motor vehicle and discharging a firearm at or into a structure already provided possible verdict alternatives to attempted murder that arguably were as good or better strategically for the defense than assault with a deadly weapon.  These already charged offenses included no problematic specific intent element and they fit perfectly with a defense strategy of directly and simply maintaining that Rahman did not have the specific intent to kill Amundson when he fired the shots into the building.  That is, these offenses – at least as effectively if not more effectively than assault with a deadly weapon – allowed the defense to present the jury with a third option to only either conviction or acquittal of attempted murder.  The defense thus actually was able to avoid the prospect that a jury presented with only the two options of conviction and acquittal on the attempted murder offense potentially would resolve any doubts as to specific intent in favor of conviction by thinking that "the defendant

---

[68]See text, *supra*, at 8-9.  As noted previously, Rahman did not follow defense counsel's advice (a) to not testify in the first instance, and (b) to stick to one consistent story if he nonetheless did so.  See text, supra, at 15 n.44.  Defense counsel thereafter had to make strategic decisions within the context of what Rahman instead actually had done in this regard.

is plainly guilty of some offense." *See Keeble v. United States*, 412 U.S. 205, 212-13 (1973). The charged firearm-discharge offenses already provided an available alternative verdict option in Rahman's case to a conviction for attempted murder with the use of a deadly weapon.

Indeed, defense counsel secured an even lesser verdict alternative, a misdemeanor, as to the offense of discharging a firearm out of a motor vehicle.[69] Rather than complicating the theory of the defense and defense message with an additional verdict alternative that involved a potentially problematic specific intent element, defense counsel's actions instead presented the jury with an additional verdict option that involved no such issue and potentially had even further reduced sentencing exposure than assault with a deadly weapon.[70]

Accordingly, in relation to the performance prong of *Strickland*, the state supreme court's implicit rejection of the claim of ineffective assistance of trial counsel in Ground 3 was neither contrary to nor an unreasonable application of clearly established federal law in light of the record and arguments presented to the state courts.

Further, on the prejudice prong of the *Strickland* analysis, the state supreme court's implicit rejection of the claim of ineffective assistance of trial counsel in Ground 3 also was neither contrary to nor an unreasonable application of clearly established federal law. As discussed *supra*, assault with a deadly weapon was not a lesser included offense of attempted murder with the use of a deadly weapon under the Nevada statutory law applicable

---

[69]See ECF No. 28, at 15-28 (Exhibit 48); ECF No. 28-2.

[70]Rahman's sentencing exposure at the relevant time on a charge of assault with a deadly weapon and discharging a firearm at or into a structure was the same, 1 to 6 years. See N.R.S. 200.471(2)(b); N.R.S. 202.285(1)(b). His sentencing exposure on the felony charge of discharging a firearm out of a vehicle was 2 to 15 years. N.R.S. 202.287(1)(b). Relying upon an alleged lesser included offense of assault with a deadly weapon as a potential verdict alternative rather than the two already-charged lesser related offenses would not give the jury a verdict alternative that had an alternative sentencing exposure that was less than Rahman already faced on the N.R.S. 202.285 (structure) charge. There thus was no strategic advantage for the defense – in this respect – to seeking a lesser included offense instruction on assault with a deadly weapon rather than relying on the already charged lesser related offenses as verdict alternatives. The Court notes in this regard that Rahman sought to establish at trial as to the N.R.S. 202.287 (vehicle) charge that he did not fire the shots from within the vehicle but instead did so allegedly while standing outside the vehicle while stopped. Conviction on the N.R.S. 202.285 (structure) charge, with the lesser felony sentencing exposure, likely was a given, however, due to his admission that he willfully fired shots at or into the structure.

-33-

to Rahman's offense.[71]  The defense was not entitled to an instruction on an only lesser related offense under Nevada law at the relevant time.  *Peck, supra.*  Petitioner therefore cannot demonstrate a reasonable probability that, but for counsel's failure to request the instruction, the result of the proceeding would have been different.

Petitioner therefore is not entitled to federal habeas relief on the claim of ineffective assistance of trial counsel in Ground 3.[72]

### *Effective Assistance of Appellate Counsel*

When evaluating claims of ineffective assistance of appellate counsel, the performance and prejudice prongs of the *Strickland* standard partially overlap.  *E.g., Bailey v. Newland*, 263 F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Effective appellate advocacy requires weeding out weaker issues with less likelihood of success.  The failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to the client for the same reason – because the omitted issue has little or no likelihood of success on appeal.  *Id.*

In the present case, no defense request was made at trial for an alleged lesser included offense instruction for assault with a deadly weapon.[73]  Petitioner relies upon Nevada precedent holding that an instruction on a lesser included offense is mandatory even without a defense request where there is evidence that could absolve the defendant of guilt on the greater offense but support conviction on the lesser offense.  *See, e.g., Rosas*, 122 Nev. at

---

[71]See text, *supra*, at 28-30.

[72]The Court would reach the same conclusion even on a *de novo* review, and without the necessity of any further record development in federal court.  The fact that assault with a dangerous weapon was not a lesser included offense of attempted murder with a deadly weapon under the Nevada state law applicable at the time of the offense wholly undercuts this claim.

[73]Petitioner points to the fact that the *prosecutor* referred to assault with a deadly weapon as a possible lesser included offense of attempted murder during the extended discussion of lesser included offenses to the firearm-discharge offenses.  ECF No. 28, at 23 (original transcript page 81).  No credible argument can be made that the *prosecutor's* passing statement preserved any issue in this regard for appeal by the defense.  Nor did the prosecutor's statement override the fact that assault with a deadly weapon in fact was not a lesser included offense of attempted murder with the use of a deadly weapon at the time due to the 2001 statutory amendment to N.R.S. 200.471.

-34-

1264 n.9, 147 P.3d at 1106 n.9.  However, as discussed at length on the prior claim, assault with a dangerous weapon was not a lesser included offense of attempted murder with the use of a dangerous weapon under the Nevada statutory law applicable at the time of Rahman's offense.[74]  There thus was no objectively viable issue for appeal in this regard.

The state supreme court's implicit rejection of this claim on state post-conviction review in 2013 accordingly was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

Petitioner therefore is not entitled to federal habeas relief on the claim of ineffective assistance of appellate counsel in Ground 3.[75]

Ground 3 thus does not provide a basis for relief.

### Ground 4(a): Effective Assistance – Objections and Preserving Issues for Appeal

In Ground 4(a), petitioner alleges that he was denied effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments when trial counsel failed to make appropriate objections and preserve the record for appeal.  Petitioner alleges specifically that trial counsel failed to object to: (1) "testimony of Detective Caldwell with regard to Rahman's statement, which according to Detective Caldwell was proof that Rahman was 'minimizing' his guilt and therefore lying that he did not intend to kill anyone;" and (2) the State's alleged "prosecutorial misconduct by failing to produce the tape-recorded conversation of Rahman allegedly threatening Main until near the end of trial."[76]

### Standard of Review Applicable to Ground 4(a)

Petitioner urged for the first time in the federal reply that the Court should consider Ground 4(a) de novo rather than under AEDPA's deferential standard of review.  He urges that de novo review is required because the Supreme Court of Nevada allegedly did not

[74]See text, supra, at 28-30.

[75]The Court would reach the same conclusion even on a de novo review without the necessity of any further record development in federal court.  See note 72, supra.

[76]ECF No. 26, at 21-22 (lines 25-26 & 1); id., at 22-23 (lines 25-26 & 1).

expressly address the claims in its decision affirming the denial of state post-conviction relief on the merits.

The state supreme court did expressly refer in its order of affirmance, however, to petitioner's claim in Ground 4(a)(2) "that trial counsel was ineffective for . . . failing to 'object to and preserve issues *relating to*' juror questions, questions from the bench, and *an audiotape of a telephone call wherein he threatened and attempted to extort one of the victims*."[77] It thus would appear that the Supreme Court of Nevada did expressly address this claim in its decision, which concluded that "the district court did not err by rejecting Rahman's ineffective-assistance claims."[78] Petitioner's initial moving premise thus is belied by the record as to his second claim, in Ground 4(a)(2).

With regard to the remaining claim, in Ground 4(a)(1), as discussed *supra* as to Ground 3, the fact that the state supreme court did not expressly mention the claim in its decision expressly addressing other claims does not automatically lead to the application of *de novo* review in federal court. Indeed, there is a presumption to the contrary that the claim was decided on the merits and thus instead is subject to deferential review under AEDPA.[79]

That presumption has not been overcome in this case as to Ground 4(a)(1).

In the statement of facts in the fast track statement on the post-conviction appeal, petitioner referenced trial counsel's failure to object to the detective's "minimizing" testimony in two "bullet points" in a "laundry list" of fourteen such bullet points noting sundry alleged deficiencies by counsel.[80] Notably, however, in the argument itself, petitioner stated as follows:

> Counsel's representation also fell below the 6th Amendment Constitutional standard when the trial counsel failed to properly object to and preserve issues relating to:

---

[77]ECF No. 14-1, a 105 (emphasis added).

[78]*Id.*, at 106.

[79]See text, *supra*, at 24-26.

[80]See ECF No. 14-1, at 74-76.

1          ●          Jury instructions;

2          ●          Questions from the jurors;

3          ●          Questions coming directly from the bench/judge
4                     herself (who was shortly thereafter removed from
                      the bench for a plethora of inequities committed in
5                     her official capacity);

6          ●          The recording of Appellant's call, wherein he is
                      alleged to have threatened the victims and
7                     attempted to extort money from them.

8    ECF No. 14-1, at 77-78.

9          This listing of the items that petitioner expressly claimed in his argument should have

10   drawn an objection from trial counsel corresponds exactly to the state supreme court's listing

11   of such items in describing petitioner's claim.[81]

12         Much as was the case with Ground 3, it does not appear that "unusual circumstances"

13   are presented that would overcome the presumption required by *Richter* and *Williams*.  The

14   Supreme Court of Nevada simply did not expressly discuss a claim as to which Rahman had

15   made only passing reference in the factual recital of the fast track statement without any

16   argument thereafter specific to the claim.  Absent unusual circumstances not demonstrated

17   here, such a common situation is subject to the *Richter-Williams* presumption.

18         The Court therefore will review the state supreme court's rejection of both claims in

19   Ground 4(a) under the AEDPA standard of review.

20         ***Ground 4(a)(1) – Failure to Object to "Minimizing" Testimony***

21         As noted, petitioner alleges that he was denied effective assistance when trial counsel

22   failed to object to "testimony of Detective Caldwell with regard to Rahman's statement, which

23   according to Detective Caldwell was proof that Rahman was 'minimizing' his guilt and

24   therefore lying that he did not intend to kill anyone."

25   / / /

26   _____

27         [81]See quoted material in the text, *supra*, at 36, at note 77.  The state supreme court expressly
     declined to address a claim based upon a failure to object to jury instructions – the first item listed – because
28   petitioner failed to raise the issue in his petitions in the district court.  See ECF No. 14-1, at 105 n.1.

1    The state supreme court's implicit rejection of this claim clearly was neither contrary

2 to nor an unreasonable application of *Strickland*.

3    At the outset, it was *defense counsel* that elicited the testimony from Detective Caldwell

4 that he believed "that Rahman was 'minimizing' his guilt."

5    Detective Caldwell testified initially during the State's case-in-chief.

6    On cross-examination, defense counsel asked a series of questions seeking to

7 establish that Rahman had provided information to the police during his custodial interrogation

8 and had not been charged thereafter for providing false information.[82]

9    On redirect, the prosecution sought to dispel the inference that the defense thereby

10 had sought to create that because Rahman was not charged for providing false information

11 he therefore necessarily must have told the whole truth to the police:

12       Q    So, in general, sometimes people give you statements and
               give you some facts about the crime.
13
         A    Yes.
14
         Q    (Indiscernible).
15
         A    They'll give us small details here and there, but –
16
         Q    Okay.  And now, in general, those statements, are they
17              always forthcoming or are they sometimes a little self-
               serving, those statements?
18
         A    The vast majority of times they minimize the details while
19              trying to – when they confess to a crime minimize details
               to try to make their involvement less than it actually was.
20
         Q    Okay.  And, in general, when that happens, do you charge
21              them with false information to a police officer?

22       A    Not (indiscernible), ma'am.

23       Q    Okay.  And just to be clear, that crime of false information
               to a police officer, what status is that?  Is that a felony,
24              misdemeanor, gross misdemeanor?

25       A    It's a misdemeanor, ma'am.

26 ECF No. 27-15, at 21.

27 _____

28       [82]ECF No. 27-15, at 20-21.

The prosecutor did not ask the detective whether he believed that Rahman was minimizing. Caldwell did not otherwise volunteer that he believed that Rahman was minimizing.

On recross, defense counsel asked only one question, in anticipation of calling Detective Caldwell again during the defense case-in-chief:

> Q    And specifically in regards to my client, do you feel he was minimizing his actions?
>
> A    Yes, sir, I do.

ECF No. 27-15, at 22.

The initial testimony that Detective Caldwell believed specifically that *Rahman* was minimizing his actions thus was elicited by *defense counsel*, not the State. Caldwell's testimony in this regard was fully responsive to the question that counsel clearly asked.

Thereafter, when the defense recalled Detective Caldwell in its case-in-chief, defense counsel pursued a series of questions on direct clearly seeking to establish the points as to which Caldwell believed that Rahman had been minimizing. Counsel then would seek to undercut Caldwell's testimony on these points by various means. For example, counsel would establish that Caldwell's "minimizing" belief on a point was based upon his own assumptions about the case, that Caldwell believed that Rahman was "minimizing" as to something that actually in fact was true, and/or that Caldwell's belief that Rahman was "minimizing" was based upon an assumption that what a complaining witness had said on the point instead was true.[83]

_____

[83]ECF No. 28, at 66-68.

Petitioner urges that after failing to object to the minimizing testimony purportedly elicited by the State (but actually elicited by the defense), defense counsel then (1) exacerbated the problem by eliciting damaging testimony about minimizing when Caldwell was recalled; (2) sought to have him declared as a hostile witness apparently as an attempt somehow to rectify that situation, and (3) thereafter "was stuck with Detective Caldwell's speculative and highly objectionable testimony." ECF No. 37, at 21.

That is not what happened at trial. The *defense,* again, elicited the testimony in question initially in the State's case in chief. Thereafter, defense counsel very obviously intentionally followed through with this

(continued...)

During cross-examination, Detective Caldwell testified regarding two police interviewing techniques, both of which included "minimizing" also by the police. The police thereby would seek to minimize the situation and sympathize with the suspect in an effort to get the suspect to confess to a crime. Defense counsel thereafter inquired further on redirect as to these techniques.[84]

At the conclusion of his testimony, the trial judge asked Caldwell several questions about alleged minimizing by suspects and Rahman in particular as well as about the minimizing done by the police. On further redirect, Caldwell ultimately acknowledged that minimizing by suspects and minimizing by the police both constituted lying.[85]

In the federal reply, the record citation that petitioner provides as to the initiating testimony to which counsel should have objected in fact is the above questioning by the trial judge.[86] However, the judge's questioning did not initiate but instead *concluded* an inquiry that already long since had been begun, and then explored extensively, *by the defense*.

[83](...continued)

line of inquiry when he recalled Caldwell. He sought to have Caldwell declared a hostile witness only after the State objected to his leading questions during the inquiry. After the objection was argued, defense counsel returned to essentially the very same question that he had asked before the objection. Compare ECF No. 28, at 66 (original transcript page 255, at lines 10-12) with *id.*, at 67 (original transcript page 259, at lines 1-5). He thereafter continued on with this same line of inquiry. He would not have returned to the same question and the same line of inquiry if the request to have Caldwell declared a hostile witness had been some sort of "damage control" misdirection stratagem undertaken in desperation after the response to an ill-conceived question went awry.

The only fair reading of the record is that defense counsel intentionally pursued exactly the line of inquiry that the trial record shows that he pursued as to Caldwell with regard to alleged "minimizing," in both the State and defense case-in-chief. Petitioner's suggestion to the contrary mischaracterizes the record.

Any other claims that might have been brought in this regard after first being properly exhausted are not before the Court herein. On the claim that is presented on the pleadings, however, the factual narrative presented by petitioner as to this testimony is not supported by the record. Nor does the actual trial record support a claim of ineffective assistance based upon defense counsel allegedly not having objected to testimony elicited by the State when the testimony instead in fact was intentionally elicited by the defense, both initially and thereafter.

[84]ECF No. 28, at 69-70.

[85]*Id.*, at 70-71 (original transcript pages 270-74).

[86]ECF No. 37, at 21, lines 2-5.

At the state post-conviction evidentiary hearing, defense counsel testified at length as to his strategy – which he used in many trials – of drawing a police witness into a discussion of police assumptions as to minimizing and of police interview techniques in order to question the reliability of those assumptions and techniques.[87]

Defense counsel did not render deficient performance when he did not object to a line of inquiry that he himself had initiated and pursued extensively.

His own initiation of that line of inquiry – which is not challenged in an exhausted claim before the Court – further was the product of a calculated strategic decision.[88]

The state supreme court's implicit rejection of this claim under the performance prong of *Strickland* thus was neither contrary to nor an unreasonable application of clearly established federal law.

Moreover, there was not even a remote possibility, much less a reasonable probability, that the result of the trial would have been different if defense counsel had objected to a line of inquiry that he himself had initiated and pursued extensively.

Nor was there a remote possibility, much less a reasonable probability, that the result on appeal would have been different if counsel had objected to a line of inquiry that he himself had initiated and pursued extensively. Any claim that would have been "preserved" by such an objection would have been meritless, under any appellate standard of review.[89]

/ / /

---

[87]ECF No. 29-13, at 17-19, 31-33 & 42-43. Counsel sought to establish in particular that the police were biased to prejudge that suspects were lying or "minimizing" and that their interview techniques were designed to elicit confessions rather than the truth. *Id.*, at 31-33.

[88]There is no exhausted claim before the Court that petitioner was denied effective assistance of counsel because defense counsel originally elicited the testimony in question.

[89]The state high court's rejection of the direct appeal claim that Rahman did pursue for lack of a contemporaneous objection resolved the claim on that appeal under the plain error standard. See ECF No. 11-1, at 38-39. The court's disposition of the claim on that basis does not necessitate a conclusion, however, that a potentially viable claim instead existed in the presence of an objection. This Court's prejudice analysis must be made with regard to the actual content of the full trial record, not with regard to representations and/or assumptions as to the content of that record made during intervening proceedings. *See Strickland*, 466 U.S. at 694-95 (an assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness or idiosyncracy as to a particular decision).

The state supreme court's implicit rejection of this claim under the prejudice prong of *Strickland* thus similarly was neither contrary to nor an unreasonable application of clearly established federal law.

At bottom, this claim is a fundamentally factually unsupported claim that is based upon premises that are refuted by the trial record. Petitioner clearly is not entitled to relief on this claim, even under a *de novo* standard of review.

Ground 4(a)(1) therefore does not provide a basis for federal habeas relief.

### Ground 4(a)(2) – Failure to Object to Alleged Prosecutorial Misconduct

As noted, petitioner alleges that he was denied effective assistance when trial counsel failed to object to the State's alleged "prosecutorial misconduct by failing to produce the tape-recorded conversation of Rahman allegedly threatening Main until near the end of trial."

The state supreme court's rejection of this claim clearly was neither contrary to nor an unreasonable application of *Strickland*.

The Court summarizes factual background relevant to this claim in the discussion of Ground 2.[90]

Petitioner did not demonstrate to the state supreme court on the post-conviction appeal that a defense objection in the trial court to the late production of the tape would have preserved a potentially viable prosecutorial misconduct claim for direct appeal. In particular, petitioner did not establish, and could not establish, in the record before that court on post-conviction review that the tape contained exculpatory evidence or impeachment material.

Trial counsel's testimony, which was in the record before the state supreme court on post-conviction review, instead reflected that the tape inculpated petitioner and that the defense was fortunate that the State did not locate the tape earlier and introduce it into evidence.[91]

_____

[90]See text, *supra*, at 17-21.

[91]ECF No. 29-13, at 33-36. The transcript of the tape that is in the record at least in this Court confirms that the tape was inculpatory rather than exculpatory. ECF No. 29-21. See also note 51, *supra*.

Petitioner has cited no apposite United States Supreme Court precedent establishing the existence of a potentially viable prosecutorial misconduct claim under the applicable general due process standard[92] premised upon the prosecution's late production of inculpatory evidence that the State did not introduce at trial. He has cited no apposite Supreme Court precedent holding that relief potentially is available on such a claim on the basis that the defense was denied an opportunity to evaluate evidence and plan a defense strategy as to inculpatory evidence that never was introduced against the defendant at trial.

A state supreme court determination that petitioner demonstrated neither deficient performance nor resulting prejudice due to trial counsel's lack of an objection to the late production thus was neither contrary to nor an unreasonable application of *Strickland*.

Ground 4(a)(2) therefore does not provide a basis for federal habeas relief.[93]

---

[92]See note 49, *supra*.

[93]Generally as to objections, petitioner maintains in the federal reply on Ground 4(a) that defense counsel "testified that his trial strategy/advocacy does not include objecting to or attempting to create a record for appellate purposes – he is only trying to win the trial by putting on evidence." ECF No. 37, at 19.

Defense counsel did in fact respond at one point as follows:

> Q    Okay. And so therefore it is important to protect the record on appeal, yes or no?
>
> A    It's important to do a good job at trial which includes making sure that legal evidence is brought forward. I'm not conducting myself to set up an appeal. I'm conducting myself to do the best job and bring out legal evidence.

ECF No. 29-13, at 47.

However, counsel also responded more directly to the same basic question earlier as follows:

> Q    . . . . All right. One of your primary jobs at trial, yes or no – if you disagree with me that's fine – is to protect the record in case your client loses so that you have a good record to go up on appeal with? Just yes or no.
>
> A    *I think I could agree to that.*

ECF No. 29-13, at 45-46 (emphasis added).

(continued...)

***Ground 4(b)(7): Effective Assistance – Petitioner's Alleged Firearms Inexperience***

In Ground 4(b)(7), petitioner alleges that he was denied effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments when trial counsel failed to present evidence that petitioner "had no training with a firearm and that any shooting would have been random, as opposed to intentionally aiming at a specific location in the building."[94]

Petitioner suggests that the claim should be reviewed *de novo*. However, the Supreme Court of Nevada clearly listed this claim as one of the claims presented by petitioner when it affirmed the denial of state post-conviction relief on the merits.[95] The claim was adjudicated on the merits and is subject to deferential review under AEDPA.

---

[93](...continued)
Petitioner thus overstates – via omission – defense counsel's actual testimony. Defense counsel undeniably testified during the overall testimony relied upon by petitioner that he viewed his "job" at trial as trying to win at trial. However, he did not deny that his job also was to preserve the record in the event of a loss at trial and appeal. He in fact acceded in his testimony that that also was one of his primary jobs at trial.

Moreover, defense counsel in fact did object on a multitude of occasions during trial. See, e.g., ECF No. 27-13, at 14-16 (multiple), 30, 35, 42-46 (extensive objection with voir dire of witness), 58-59, 63-64, 68 & 70; ECF No. 27-15, at 5, 12, 21, 25-32 (extensive objection with voir dire of witness) & 36; ECF No. 27-16, at 8, 18-24 (multiple objections; extensive argument), & 34-35; ECF No. 28, at 44-45, 50, 53, 54, 57, 58 & 68.

In any event, petitioner's disagreement with defense counsel's approach, in general, to objections does not present a viable claim of ineffective assistance of counsel under *Strickland*. A reviewing court is not going to grant state or federal post-conviction relief based on philosophical differences as to how to defend criminal cases generally. Rather, a petitioner must identify specific failures to object that allegedly were deficient and resulted in prejudice. The two specific instances where counsel did not object relied upon in Ground 4(a) do not provide a basis for federal habeas relief for the reasons discussed in the text.

In this same vein, petitioner points to a portion of the trial transcript where the trial judge admonished the experienced defense counsel – in the presence of the jury during the first prosecution witness – that he should object more, because a question was leading. See ECF No. 27-13, at 16 (the judge stated that "the rules are the rules . . . [w]hether it's a minor matter or an important matter . . . you're not supposed to lead on direct"). How much to object and to what in a jury trial present a paradigm case of a strategic decision by trial counsel, subject to a multitude of considerations. If petitioner or even the state court trial judge disagreed philosophically with trial counsel's approach to defending a criminal case in this regard, that is not a matter cognizable on federal habeas review. While petitioner relies upon the trial judge's admonishment on this point, he notes elsewhere, regarding questions to witnesses from the bench, that the judge was suspended a short time later and ultimately removed from office. See ECF No. 26, at 27 n.8. In all events, the judge's admonition that defense counsel should object more does not lead to a contrary conclusion on Ground 4(a).

[94]ECF No. 26, at 26. All remaining claims in Ground 4 were abandoned as unexhausted.

[95]ECF No. 14-1, at 105. See also text, *supra*, at 24-26 (regarding *de novo* review generally).

-44-

At trial, Rahman testified, in response to questions from the jury and the trial judge, that he had learned to handle the gun used in the offense over a year-and-a-half period while living previously in a remote area in Texas, that he would shoot at a building out in the back yard during that time, and that the gun "had been sitting there" unused thereafter for five years. His trial testimony at other points in his testimony further reflected that he was very familiar with the operation of the pistol.[96]

At the state post-conviction evidentiary hearing, defense counsel testified that it was a mistake on his part to not ask Rahman about his alleged inexperience with firearms and that he was pleased when he saw that the testimony was elicited at trial in response to the jury question.[97]

Petitioner presented no other evidence on state post-conviction review establishing what additional testimony or evidence, if any, counsel could have or should have presented as to Rahman's alleged lack of training or inexperience with firearms.

On the record presented to that court, the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*.

Even assuming *arguendo* deficient performance, petitioner failed to demonstrate resulting prejudice on state post-conviction review. Petitioner failed to present any additional evidence to the state courts on post-conviction review establishing what evidence or testimony defense counsel should have presented to the jury beyond that already presented in response to the jury questions. Petitioner urges in the federal reply that Rahman could have responded more coherently rather than being allegedly unprepared and disjointed if counsel instead had prepared him to testify on the point on direct. Even if the Court assumes that such an allegation of prejudice was presented to the state courts, a state court rejection of such a tenuous and nuanced claim of prejudice would not be an unreasonable application of the general prejudice standard in *Strickland*. *See, e.g., Richter*, 562 U.S. at 105 ("The

---

[96]See text, *supra*, at 9-10.

[97]ECF No. 29-13, at 22-24.

*Strickland* standard is a general one, so the range of reasonable applications is substantial.")
A determination, on the showing made to the state courts, that there was not a reasonable
probability of a different outcome at trial due to defense counsel's failure to elicit testimony
regarding Rahman's level of firearms experience when such testimony came in through other
questioning was not an unreasonable application of that general standard.

Ground 4(b)(7) therefore does not provide a basis for federal habeas relief.[98]

### *Consideration of Possible Issuance of a Certificate of Appealability*

Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must
issue or deny a certificate of appealability (COA) when it enters a final order adverse to the
applicant.

As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c),
a petitioner must make a "substantial showing of the denial of a constitutional right" in order
to obtain a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000);
*Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999). To satisfy this standard, the petitioner
"must demonstrate that reasonable jurists would find the district court's assessment of the
constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484.

The Court denies a certificate of appealability as to all claims, for the reasons below.

In Ground 1, petitioner alleges that the evidence was insufficient to sustain his
conviction for attempted murder with a deadly weapon because there allegedly was
insufficient evidence that he had the requisite specific intent to kill the victim. The Court has
extensively summarized trial evidence relevant to this claim. **See text, *supra*, at 1-11.[99]** At

---

[98]In the federal reply on this claim, petitioner refers to the trial court expanding the inquiry by the jury
on its own volition "without objection from trial counsel". ECF No. 37, at 24. In Ground 4(d), petitioner
presented a claim of ineffective assistance based upon trial counsel's alleged failure to object to questions
posed by the jury and to follow up questions by the trial court. After respondents moved to dismiss that claim
and other claims as unexhausted, petitioner filed a motion to voluntarily dismiss the claims. The Court
dismissed Ground 4(d) on petitioner's motion, and the claim no longer is presented in this matter. Petitioner
may not resurrect the dismissed claim thereafter in the reply in arguing a remaining claim.

[99]All page citations to record exhibits herein are to the CM/ECF generated electronic document page
number in the page header, not to any page number in the original transcript or document.

bottom, the jury had ample circumstantial evidence from which to infer the requisite specific intent under the evidence viewed in the light most favorable to the prosecution. After expressly threatening to kill the victim two days prior and reaffirming that he meant his threats the following day, petitioner fired seven large caliber bullets at the victim's office building during office hours within feet of where the victim actually was sitting in his office, with one round passing exactly through the space where the victim normally would have been sitting in front of his computer monitor. The jury was not required to disregard this permissible inference as to the required specific intent simply because petitioner testified that he did not intend to kill the victim, particularly given the equivocal, inconsistent and contradictory nature of his testimony. **See text, *supra*, at 12-16.** Reasonable jurists would not find this Court's holding that the state supreme court's rejection of this claim withstands review under AEDPA to be either debatable or wrong.

In Ground 2, petitioner alleges that he was denied a fair trial due to prosecutorial misconduct when the State did not produce an audiotape from the telephone call upon which his extortion charge was based until late in the trial after the complaining witness had testified, on the premise that the late production denied defense counsel an opportunity to evaluate the evidence and plan a defense strategy. The tape was not introduced into evidence by either party, and no objection or request for relief was made in the trial court by the defense with regard to the tape. No record evidence was presented to the state supreme court that the tape contained exculpatory or impeachment information. No record evidence was presented to the state supreme court as to even the actual content of the tape or the circumstances of its late production. Given the bare factual record presented to the state supreme court and the applicable broad general due process standard, reasonable jurists would not find this Court's holding that the state supreme court's rejection of this claim withstands review under AEDPA to be either debatable or wrong. **See text, *supra*, at 17-21.** Moreover, even if the Court considered the likely actual factual circumstances as reflected by the more expansive federal record, on a *de novo* review, there simply is no factual basis for a claim of a due process violation due to alleged prosecutorial misconduct. **See text, *supra*, at 21 n.51.**

In Ground 3, petitioner alleges that: (a) he was denied effective assistance of trial counsel when counsel failed to seek an allegedly lesser included offense instruction as to assault with a deadly weapon on the charge of attempted murder with the use of a deadly weapon; and (b) he was denied effective assistance of appellate counsel when counsel failed to raise the failure to give the instruction on direct appeal.  The claims are subject to deferential review under AEDPA even though the state supreme court did not expressly address these particular claims in its final post-conviction appeal decision that expressly rejected other claims on the merits.  **See text, *supra*, at 22-26.**  An implicit conclusion that trial counsel did not render deficient performance withstands review under AEDPA because: (1) assault with a deadly weapon in fact was not a lesser included offense of attempted murder with the use of a deadly weapon under the Nevada statutory law that was applicable at the time of petitioner's offense, **see text, *supra*, at 28-30**; (2) on the bare record presented to the state supreme court, there were a range of legitimate strategic reasons for trial counsel to proceed as he did even if assault with a deadly weapon instead had been a lesser included offense at the relevant time, **see text, *supra*, at 30-33;** and (3) given that assault with a deadly weapon was not a lesser included offense of attempted murder with a deadly weapon at the relevant time under Nevada law, petitioner cannot establish prejudice under *Strickland*, **see text, *supra*, at 33-34.**  An implicit conclusion that petitioner also was not denied effective assistance of appellate counsel withstands review under AEDPA because assault with a deadly weapon was not a lesser included offense at the relevant time under Nevada law.  **See text, *supra*, at 34-35.**  Reasonable jurists accordingly would not find this Court's holding that the state supreme court's rejection of these claims withstands review under AEDPA to be either debatable or wrong.  Moreover, even if the claims were considered *de novo*, the fact that assault with a deadly weapon was not a lesser included offense of attempted murder with the use of a deadly weapon under Nevada law at the relevant time wholly undercuts the claims, without a need for any further record development on federal habeas review.  The claims, at bottom, are grounded on a legal premise that is unsupported by Nevada state authority apposite to the actual time of the offense.

In Ground 4(a), petitioner alleges that he was denied effective assistance of trial counsel when counsel failed to make objections and preserve issues for appeal. In Ground 4(a)(1), he relies upon counsel's lack of objection to testimony by a detective that petitioner was "minimizing" his guilt in his statements to police. In Ground 4(a)(2), he relies upon counsel's lack of objection to prosecutorial misconduct as alleged in Ground 2 when the State did not produce a tape of a conversation where petitioner allegedly extorted one of the victims until near the end of trial.

The claims in Ground 4(a) are subject to deferential review under AEDPA rather than *de novo* review. **See text, *supra*, at 35-37.**

On Ground 4(a)(1), the full trial record instead reflects that it was defense counsel that initially elicited testimony from the detective that petitioner was "minimizing" and thereafter developed the testimony further. Counsel did so for strategic reasons to question both police assumptions and interrogation methods, and there in any event is no exhausted claim presented herein challenging counsel's decision to elicit the testimony in the first instance. On the claim that is presented, the state supreme court's implicit rejection of a claim that counsel was ineffective for failing to object to testimony that he himself first elicited and developed extensively was neither contrary to nor an unreasonable application of *Strickland*. Reasonable jurists therefore would not find this Court's holding that the state supreme court's rejection of this claim withstands review under AEDPA to be debatable or wrong. Moreover, the claim is in any event without merit even on a *de novo* review because it is based upon a mischaracterization of the trial record, given that it in fact was the defense that elicited the testimony in the first instance. **See text, *supra*, at 37-42.**

On Ground 4(a)(2), petitioner did not, and could not, establish in the record before the state supreme court on the state post-conviction appeal that the tape in question contained exculpatory evidence or impeachment material. The record before that court reflected that the tape was inculpatory and that it was not introduced at trial by the State due to the late production. Petitioner cites no apposite United States Supreme Court precedent establishing a potentially viable prosecutorial misconduct direct appeal claim based on late production of

1  inculpatory evidence that is not introduced at trial. A state supreme court determination that

2  petitioner demonstrated neither deficient performance nor resulting prejudice due to trial

3  counsel's lack of objection thus was neither contrary to nor an unreasonable application of

4  *Strickland*. Reasonable jurists therefore would not find this Court's holding that the state

5  supreme court's rejection of the claim withstands review under AEDPA to be debatable or

6  wrong. **See text, supra, at 42-43.**

7          To the extent that petitioner otherwise seeks relief under Ground 4(a) premised upon

8  a general philosophical disagreement with defense counsel's approach to trial objections over

9  and above these two specific claims, Ground 4(a) does not present a viable claim for federal

10  habeas relief. **See note 93, *supra*.**

11          Finally, in Ground 4(b)(7), petitioner alleges that he was denied effective assistance

12  when trial counsel failed to present evidence that petitioner had no firearms training. The

13  claim was rejected on the merits, and it therefore is subject to deferential AEDPA review.

14  Testimony was elicited from petitioner at trial as to the level of his firearms experience in

15  response to questions from the jury and court. Trial counsel testified at the state court

16  evidentiary hearing that he did not elicit such testimony instead himself through mistake, but

17  petitioner did not otherwise make any showing on state post-conviction review as to what

18  additional evidence or testimony should have been presented. On such a record, a

19  determination by the state supreme court that the any *arguendo* deficient performance did not

20  result in prejudice would not be an unreasonable application of the general prejudice standard

21  in *Strickland*. Reasonable jurists therefore would not find this Court's holding that the state

22  supreme court's rejection of this claim withstands review under AEDPA to be debatable or

23  wrong. **See text, supra, at 44-46.**

24          A certificate of appealability accordingly will be denied as to all claims.

25          IT THEREFORE IS ORDERED that the petition for a writ of habeas corpus is DENIED

26  on the merits and that this action shall be DISMISSED with prejudice.

27          IT FURTHER IS ORDERED that a certificate of appealability is DENIED, for the

28  reasons stated at pages 46-50 of the Court's order.

The Clerk of Court shall enter final judgment accordingly, in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED: August 8, 2017

_____
Gloria M. Navarro, Chief Judge
United States District Court